1
2
3
4
5
6
7

8                    UNITED STATES DISTRICT COURT

9                 FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11   EUGENIO PEJI,                          No.  2:13-cv-2647 KJM KJN P

12              Plaintiff,

13        v.                                ORDER AND FINDINGS AND
                                            RECOMMENDATIONS
14   CDCR, et al.,

15              Defendants.

16

17   <u>Introduction</u>

18        Plaintiff is a state prisoner, proceeding without counsel, with a civil rights action pursuant

19   to 42 U.S.C. § 1983.  Pending before the court is defendants' summary judgment motion.  (ECF

20   No. 37.)  After carefully reviewing the record, the undersigned recommends that defendants'

21   motion be granted.

22   <u>Legal Standard for Summary Judgment</u>

23        Summary judgment is appropriate when it is demonstrated that the standard set forth in

24   Federal Rule of Civil procedure 56 is met.  "The court shall grant summary judgment if the

25   movant shows that there is no genuine dispute as to any material fact and the movant is entitled to

26   judgment as a matter of law."  Fed. R. Civ. P. 56(a).

27            Under summary judgment practice, the moving party always bears
              the initial responsibility of informing the district court of the basis
28            for its motion, and identifying those portions of "the pleadings,

                                           1

1
2

> depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," which it believes demonstrate the absence of a genuine issue of material fact.

3

Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986) (quoting then-numbered Fed. R. Civ. P.

4

56(c)).

5

"Where the nonmoving party bears the burden of proof at trial, the moving party need

6

only prove that there is an absence of evidence to support the non-moving party's case." Nursing

7

Home Pension Fund, Local 144 v. Oracle Corp. (In re Oracle Corp. Sec. Litig.), 627 F.3d 376,

8

387 (9th Cir. 2010) (citing Celotex Corp., 477 U.S. at 325); see also Fed. R. Civ. P. 56 advisory

9

committee's notes to 2010 amendments (recognizing that "a party who does not have the trial

10

burden of production may rely on a showing that a party who does have the trial burden cannot

11

produce admissible evidence to carry its burden as to the fact"). Indeed, summary judgment

12

should be entered, after adequate time for discovery and upon motion, against a party who fails to

13

make a showing sufficient to establish the existence of an element essential to that party's case,

14

and on which that party will bear the burden of proof at trial. Celotex Corp., 477 U.S. at 322.

15

"[A] complete failure of proof concerning an essential element of the nonmoving party's case

16

necessarily renders all other facts immaterial." Id. at 323.

17

Consequently, if the moving party meets its initial responsibility, the burden then shifts to

18

the opposing party to establish that a genuine issue as to any material fact actually exists. See

19

Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). In attempting to

20

establish the existence of such a factual dispute, the opposing party may not rely upon the

21

allegations or denials of its pleadings, but is required to tender evidence of specific facts in the

22

form of affidavits, and/or admissible discovery material in support of its contention that such a

23

dispute exists. See Fed. R. Civ. P. 56(c); Matsushita, 475 U.S. at 586 n.11. The opposing party

24

must demonstrate that the fact in contention is material, i.e., a fact that might affect the outcome

25

of the suit under the governing law, see Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248

26

(1986); T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir.

27

1987), and that the dispute is genuine, i.e., the evidence is such that a reasonable jury could return

28

a verdict for the nonmoving party, see Wool v. Tandem Computers, Inc., 818 F.2d 1433, 1436

1    (9th Cir. 1987), <u>overruled in part on other grounds</u>, <u>Hollinger v. Titan Capital Corp.</u>, 914 F.2d

2    1564, 1575 (9th Cir. 1990).

3          In the endeavor to establish the existence of a factual dispute, the opposing party need not

4    establish a material issue of fact conclusively in its favor.  It is sufficient that "the claimed factual

5    dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at

6    trial." <u>T.W. Elec. Serv.</u>, 809 F.2d at 630.  Thus, the "purpose of summary judgment is to 'pierce

7    the pleadings and to assess the proof in order to see whether there is a genuine need for trial.'"

8    <u>Matsushita</u>, 475 U.S. at 587 (quoting Fed. R. Civ. P. 56(e) advisory committee's note on 1963

9    amendments).

10          In resolving a summary judgment motion, the court examines the pleadings, depositions,

11   answers to interrogatories, and admissions on file, together with the affidavits, if any.  Fed. R.

12   Civ. P. 56(c).  The evidence of the opposing party is to be believed.  <u>See</u> <u>Anderson</u>, 477 U.S. at

13   255.  All reasonable inferences that may be drawn from the facts placed before the court must be

14   drawn in favor of the opposing party.  <u>See</u> <u>Matsushita</u>, 475 U.S. at 587.  Nevertheless, inferences

15   are not drawn out of the air, and it is the opposing party's obligation to produce a factual

16   predicate from which the inference may be drawn.  <u>See</u> <u>Richards v. Nielsen Freight Lines</u>, 602 F.

17   Supp. 1224, 1244-45 (E.D. Cal. 1985), <u>aff'd</u>, 810 F.2d 898, 902 (9th Cir. 1987).  Finally, to

18   demonstrate a genuine issue, the opposing party "must do more than simply show that there is

19   some metaphysical doubt as to the material facts. . . .  Where the record taken as a whole could

20   not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for

21   trial.'"  <u>Matsushita</u>, 475 U.S. at 586 (citation omitted).

22          By contemporaneous notice provided on July 30, 2014, (ECF No. 22-2), plaintiff was

23   advised of the requirements for opposing a motion brought pursuant to Rule 56 of the Federal

24   Rules of Civil Procedure.  <u>See</u> <u>Rand v. Rowland</u>, 154 F.3d 952, 957 (9th Cir. 1998) (<em>en banc</em>);

25   <u>Klingele v. Eikenberry</u>, 849 F.2d 409 (9th Cir. 1988).

26   <u>Plaintiff's Claims</u>

27          This action is proceeding on the original complaint as to defendants Clark, Dhillon and

28   Rading.  (ECF No. 1.)  Plaintiff alleges that defendants violated his Eighth Amendment right to

1   adequate medical care by failing to provide him with adequate pain medication and by causing

2   him to be inappropriately housed at California State Prison-Solano ("CSP-Solano").

3       All defendants are employed at the California Medical Facility ("CMF").  (Id. at 2.)

4   Defendant Dhillon is plaintiff's primary care provider at CMF.  (Id.)  Defendant Rading is the

5   Chief Physician and Surgeon at CMF.  (Id.)  Defendant Clark is the Chief Executive Officer at

6   CMF.  (Id.)

7       Plaintiff alleges that he suffers from leukemia, end stage liver disease, hepatitis C,

8   "esophageal varcibs," diabetes, hypertension, neuropathy and asthma.  (Id. at 3.)  Plaintiff alleges

9   that on or before April 12, 2013, he informed defendants that he was experiencing pain due to his

10  many ailments.  (Id. at 4.)  Plaintiff alleges that defendant Dhillon determined that plaintiff would

11  be treated with Amitriptyline, an anti-depressant.  (Id.)

12      Plaintiff alleges that on May 30, 2013, defendant Clark determined that plaintiff's care

13  was consistent with "the World Health Organization's pain management ladder ... as such the

14  pain management would not be advanced."  (Id.)  Plaintiff alleges that defendant Clark refused to

15  provide plaintiff with pain management at the level of care he needed.  (Id.)  Plaintiff alleges that

16  the World Health Organization's pain management ladder does not address all of the conditions

17  from which he suffers.  (Id.)  Plaintiff alleges that his neuropathy and end stage liver disease

18  coupled with his other ailments makes for a very painful and uncomfortable existence.  (Id. at 5.)

19      Plaintiff alleges that on May 10, 2013, defendant Rading determined that the anti-

20  depressant, Amitriptyline, would best serve plaintiff.  (Id.)

21      Plaintiff also alleges that even though he is wheelchair bound and should be permanently

22  placed in an Outpatient Housing Unit ("OHU"), defendants caused him to be transferred to CSP-

23  Solano.  (Id. at 7.)  Plaintiff alleges that the central health facility at CSP-Solano is approximately

24  one quarter mile from plaintiff's housing.  (Id. at 9.) Plaintiff alleges that while housed at CSP-

25  Solano, he had two life threatening episodes which could have been avoided had he been properly

26  housed.  (Id.)

27  ////

28  ////

4

1  Legal Standard for Eighth Amendment Claims

2       To succeed on an Eighth Amendment claim predicated on the denial of medical care, a

3  plaintiff must establish that he had a serious medical need and that the defendant's response to

4  that need was deliberately indifferent.  Jett v. Penner, 439 F.3d 1091, 1096 (9th Cir. 2006); see

5  also Estelle v. Gamble, 429 U.S. 97, 106 (1976).  A serious medical need exists if the failure to

6  treat the condition could result in further significant injury or the unnecessary and wanton

7  infliction of pain.  Jett, 439 F.3d at 1096.  Deliberate indifference may be shown by the denial,

8  delay or intentional interference with medical treatment or by the way in which medical care is

9  provided.  Hutchinson v. United States, 838 F.2d 390, 394 (9th Cir. 1988).  To act with deliberate

10  indifference, a prison official must both be aware of facts from which the inference could be

11  drawn that a substantial risk of serious harm exists, and he must also draw the inference.  Farmer

12  v. Brennan, 511 U.S. 825, 837 (1994).  Thus, a defendant is liable if he knows that plaintiff faces

13  "a substantial risk of serious harm and disregards that risk by failing to take reasonable measures

14  to abate it."  Id. at 847.  "[I]t is enough that the official acted or failed to act despite his

15  knowledge of a substantial risk of serious harm."  Id. at 842.

16       A physician need not fail to treat an inmate altogether in order to violate that inmate's

17  Eighth Amendment rights.  Ortiz v. City of Imperial, 884 F.2d 1312, 1314 (9th Cir. 1989).  A

18  failure to competently treat a serious medical condition, even if some treatment is prescribed, may

19  constitute deliberate indifference in a particular case.  Id.

20       It is well established that mere differences of opinion concerning the appropriate treatment

21  cannot be the basis of an Eighth Amendment violation.  Jackson v. McIntosh, 90 F.3d 330, 332

22  (9th Cir. 1996); Franklin v. Oregon, 662 F.2d 1337, 1344 (9th Cir. 1981).

23  Discussion re:  Alleged Failure to Provide Adequate Pain Medication

24       *Defendant Dhillon's Declarations*

25       In their summary judgment motion, defendants argue that they did not act with deliberate

26  indifference to plaintiff's medical needs with respect to plaintiff's pain medications.  In his

27  original declaration submitted in support of the summary judgment motion, defendant Dhillon

28  stated, in relevant part,

5

3.  At all relevant times, I was a medical doctor employed by the CDCR.  My primary duty was to provide medical care and treatment to inmates at the California Medical Facility in Vacaville, California (CMF).

4.  I was the treating and primary care provider for plaintiff, an inmate at CMF, from approximately March through August 2013, and again from May through September 2014, in the Ambulatory Care Clinic (ACC).  In addition to personally treating plaintiff, I have reviewed his pertinent records.

5.  At all times relevant to the complaint, plaintiff was an overweight male in his early 50's with diabetes mellitus, hypertension, osteoarthritis of the knees, history of carpel tunnel syndrome, peripheral neuropathy, asthma, hepatitis C, and history of drug abuse.  Plaintiff did not have leukemia at the time I saw him, but he did have a leukemia diagnosis in the past that spontaneously resolved.  His remission occurred without any treatment.

6.  I provided plaintiff with medical care and treatment for each of his medical conditions.  He was treated with steroid injections in his knees, physical therapy, Tylenol, Tylenol with codeine, and Amitriptyline for neuropathy and chronic pain.  I advised him to control his diet, exercise and lose weight.  At all relevant times, I observed plaintiff to be fairly comfortable, alert, awake, oriented, ambulatory, and able to perform activities of daily living without support.   On multiple occasions, I observed plaintiff happily walking, talking, smiling and laughing when coming to Insulin line and ACC.  I never observed plaintiff with significant discomfort or pain.

7. Plaintiff claims that I was deliberately indifferent to his serious medical needs as set forth in two appeals Plaintiff submitted under the CDCR-602HC Inmate/Parolee Health Care Appeal From (602 appeal).

8.  In 602 appeal number 13038009, plaintiff disagreed with the treatment that CMF medical staff and I provided for his pain management.  Attached hereto as Exhibit A are true and correct copies of plaintiff's appeal records, including the first, second and third level Institution Responses to this appeal, which are also attached to plaintiff's complaint.   On May 8, 2013, I saw and interviewed Plaintiff in ACC regarding this 602 appeal; he was also scheduled for further pain management evaluation.  As stated in the Exhibit A documents, CMF staff and I determined that the medications I prescribed, including Amitriptyline, Tylenol, and Tylenol with Codeine were medically appropriate to treat and manage plaintiff's neuropathy and chronic pain. As plaintiff alleges, Amitriptyline is an antidepressant, but it is also an effective medication to treat neuropathy and chronic pain.  In this case, the medications I prescribed provided the level of care needed to effectively treat and manage plaintiff's neuropathy and chronic pain.

6

1
2
3
4
5
6

> 9. Plaintiff's first and second level 602 appeals regarding his pain management were partially granted. See Exhibit A, first level response dated May 10, 2013; and second level response dated May 30, 2013. Plaintiff was receiving medically appropriate care for pain management, and he was scheduled for further examination and consultation for pain management with me. Ibid. Any change in plaintiff's medical condition could, at any time, warrant a change in his medical treatment for pain. Plaintiff's appeal was partially granted because at all times CMF medical staff and I are prepared to modify treatment when a patient's medical conditions change.

7

(ECF No. 37-3 at 1-3.)

8      In his verified declaration filed in support of his opposition, plaintiff stated that during the

9   relevant time period, he was housed in administrative segregation ("ad seg"). (ECF No. 39 at 23.)

10   Plaintiff stated that while he was in ad seg, all medications were brought to his cell. (Id.) Based

11   on his placement in ad seg, plaintiff stated that defendant Dhillon could not have observed him

12   coming to the insulin line, as claimed by defendant Dhillon in his declaration. (Id.)

13      On May 22, 2015, the undersigned ordered defendants to file further briefing addressing

14   plaintiff's claims regarding defendant Dhillon's ability to observe him. (ECF No. 43.)

15   Defendants were ordered to address plaintiff's claim that he was in ad seg during the relevant

16   time period and his insulin was brought to his cell. (Id.) Defendants were also directed to

17   address how defendant Dhillon was able to observe plaintiff perform the activities of daily living

18   if plaintiff was housed in ad seg during the relevant time period. (Id.) Defendants were also

19   directed to address how defendant Dhillon was able to observe plaintiff walking if plaintiff was

20   wheelchair bound, as alleged in the complaint. (Id.) The undersigned ordered that plaintiff could

21   file a reply to defendants' supplemental briefing.

22      On June 12, 2015, defendants filed a supplemental declaration by defendant Dhillon.

23   (ECF No. 44-2.) In his supplemental declaration, defendant Dhillon states, in relevant part,

24
25
26

> 4. Plaintiff's records show that he has not been issued a wheelchair permanently. Also, based on my personal observations, examinations and medical treatment, plaintiff was neither wheelchair bound, nor did he have a medical need for a wheelchair.

27
28

> a. Exhibit 2A is a general summary of, among other things, plaintiff's placement, accommodations, and restrictions within CDCR. As a physician I see this form frequently, and it often helps me determine appropriate medical care for his [sic] patients; it

7

appears on the computer record of each of my patients at CMF.  An earlier version of this summary form is attached to Plaintiff's Complaint.  See Docket # 1 at 23.  If CDCR issues a wheelchair to an inmate, then it would be noted in this general summary.  The form in plaintiff's central file shows that, from his incarceration date in 1996 to the present, he has been issued a brace, a cane, C-PAP machine, and shoes.  Exhibit 2A at 1.  But according to Exhibit 2A, plaintiff has not been issued a wheelchair permanently.  Ibid.

b.  When plaintiff visited me in Ambulatory Care Clinic (ACC), he would sometimes, but not always, be brought down in a wheelchair, which inmates may request for temporary use to be transported to see me.  During each visit with me, plaintiff was able to stand up, walk, remove his clothes, and demonstrate and perform activities of daily living.  (ADL).  Based on my personal observations, examinations and treatment of plaintiff, at no time did I think or opine that he was wheelchair bound or that he had a medical need for a wheelchair.

5.  Plaintiff's records show that he was housed in Administrative Segregation (Ad-Seg) at CMF.  Plaintiff's housing in Ad-Seg did not prevent me or other staff from observing whether he could perform ADLs and transferring him for proper treatment if necessary.  At no time relevant did I, or other CMF staff, observe that plaintiff could not perform ADLs.

a.  Exhibit 2B, page one, shows that plaintiff was housed in Ad-Seg until he was transferred to CSP-Solano in August 2013.

b.  If a CMF inmate in Ad-Seg is unable to perform ADLs, then the correctional staff will notify the medical staff and the inmate is transferred to the Correctional Treatment Center (CTC).  If an inmate cannot perform ADLs, then his placement in the CTC overrides all other non-medical considerations.  At CMF, there are Ad-Seg cells in the CTC.  At no time was I notified by CMF correctional staff that plaintiff was unable to perform ADLs and would require transfer to CTC.

c.  If a CMF inmate in Ad-Seg is unable to perform ADLs, then the inmate can demonstrate it directly to his physician who will then transfer the inmate to CTC.  Inmates housed in Ad-Seg at CMF see physicians in ACC.  As a general practice, physicians at CMF do not see inmates in Ad-Seg cells.  Plaintiff's office visits to me were in ACC, not in his Ad-Seg cell.  Based on my personal observations, examinations and treatment of Plaintiff, at no time did I determine that plaintiff was unable to perform ADLs.

6.  In my original declaration, I stated:  "On multiple occasions, I observed plaintiff happily walking, talking, smiling and laughing when coming to Insulin line and ACC."  Original Declaration ¶ 6.  However, these are my recent observations of plaintiff, who is now housed in the General Population at CMF.  See Exhibit A2.  Plaintiff was housed in Ad-Seg at all times relevant to the complaint, and thus received Insulin in Ad-Seg, not in the general

1

> Insulin line.  I did not observe plaintiff in the general Insulin [line]
> while he was housed in Ad Seg.  However, at all relevant times I
> never observed Plaintiff with significant discomfort or pain.

2

3   (ECF No. 44-2 at 4.)

4        In his supplemental declaration, defendant Dhillon clarifies that his statement in his

5   original declaration that, during the relevant time period, he observed plaintiff happily walking

6   when coming to the Insulin line was not accurate.  In his supplemental declaration, defendant

7   Dhillon clarifies that this is a recent observation.  Good cause appearing, the sentence in

8   defendant Dhillon's original declaration stating that he observed plaintiff walking happily, etc.

9   when coming to the Insulin line is stricken.

10       The undersigned is significantly troubled by defendant Dhillon's misstatement in his

11  original declaration regarding the timing of his observations of plaintiff walking from the Insulin

12  line, as this statement was represented as relevant to defendant's decisions regarding plaintiff's

13  pain medication and as a basis for defendants seeking summary judgment herein.  The

14  undersigned acknowledges that these types of misstatements are not a common occurrence in

15  pleadings received from the Office of the Attorney General.  Nevertheless, in an effort to curb

16  future material misrepresentations and misstatements such as those contained in defendant

17  Dhillon's original declaration, the undersigned orders service of these findings and

18  recommendations on Supervising Deputy Attorney General Monica Anderson.

19       *Analysis—Plaintiff's Serious Medical Needs*

20       The parties do not dispute that plaintiff suffered from the following serious medical needs:

21  diabetes mellitus, hypertension, osteoarthritis of the knees, a history of carpel tunnel syndrome,

22  peripheral neuropathy, asthma and hepatitis C.   (See ECF No. 39 at 12.)  Plaintiff disputes

23  defendant Dhillon's claim that at the time defendant Dhillon treated him, plaintiff's leukemia had

24  spontaneously resolved and was in remission.

25       In support of his claim that his leukemia was not in remission, plaintiff cites Exhibit A

26  attached to his opposition.  (Id.)  Exhibit A includes records from outside hospitals where plaintiff

27  was seen on October 18, 2013, and October 25, 2013.  (Id. at 26-46.)  For the following reasons,

28  the undersigned finds that these records do not demonstrate that plaintiff's leukemia was not in

1    remission when defendant Dhillon treated plaintiff in 2013 and 2014.

2         Included are records from VacaValley Hospital and the San Joaquin General Hospital.

3    (Id. at 26-27, 31- 34, 37-45.)  The records indicate that plaintiff was first taken to VacaValley

4    Hospital on October 18, 2013 and then transferred that same day to the San Joaquin General

5    Hospital.  (Id. at 37.)   The records indicate that plaintiff was discharged from the San Joaquin

6    General Hospital on October 21, 2013.  (Id.)  The records indicate that plaintiff was treated at

7    these hospitals for complaints of chest pain.   (Id. at 26-27, 31,-34, 37-45.)  These records do not

8    address plaintiff's leukemia.  (Id. at 26-27, 31-34, 37-45.)

9         The next record was prepared by Dr. Lesley C. Martin on October 25, 2013.  (28-30, 36.)

10   The medical facility where Dr. Martin examined plaintiff is not clear.  In relevant part, the record

11   states,

12        Clinical Assessment  The patient is a 51 year old male who presents
13        with  large  granular  lymphocytic  leukemia.  The  patient's  prior
          health status has been fair.

14        Assessment Plan  (R)    Large  granular  lymphocytic  leukemia
15        (204.80)

16        I strongly doubt his fatigue is due to LGL given his normal CBC>
          Even  the  mild  anemia  in  the  hospital  last  weekend  has  been
17        improving.  I think it is more likely his fatigue is due to lack of
          activity, deconditioning, heart failure, dysrhythmia.  I will see him
18        back in 3 months to review with him.  I strongly encourage more
          physical  activity  and  we  discussed  ways  to  increase  physical
19        activity in his dorm, etc. RTO 3 months with repeat labs.

20        I also recommend he stop all sedating meds like Amitryptiline.  I
          doubt this is low testosterone given his muscle bulk, but that is also
21   (Id. at 28.)    on the differential.

22        Dr. Martin's October 25, 2013 report does not demonstrate that plaintiff's leukemia was

23   no longer in remission in 2013.  In this report, Dr. Martin states that she strongly doubts that

24   plaintiff's fatigue was due to leukemia due to his normal CBC and improving anemia.  Dr. Martin

25   concluded that plaintiff's fatigue was more likely due to his lack of physical conditioning.

26        On July 20, 2015, plaintiff filed his supplemental reply briefing.  (ECF No. 47.)  Attached

27   are additional records that plaintiff alleges demonstrate that his leukemia was not in remission

28   during the relevant time period.  Included is a record from the Mount Diablo-Solano Oncology

Group dated July 13, 2012. (ECF No. 47 at 22.)  The report states that plaintiff had T cell large

granular lymphocytic leukemia and anemia.  (<u>Id.</u>)   Although not entirely clear, it appears that at

the time this report was prepared, plaintiff's leukemia was not in remission.  (<u>Id.</u>)

Plaintiff has also attached another report by Dr. Martin dated April 28, 2013.  (<u>Id.</u> at 25.)

This report states, in relevant part,

> Assessment/Plan
>
> (R) Large granular lymphocytic leukemia (204.80)
>
> CBC is stable in 2/2013.  RTO in 3-4 months with repeat labs.  No indication for treatment at this time.

(<u>Id.</u>)

Plaintiff has also submitted a report prepared by Dr. Martin on April 19, 2015.  (<u>Id.</u> at 27.)

This report states that Dr. Martin saw plaintiff for his large granular lymphocytic leukemia.  (<u>Id.</u>

at 27.)  Dr. Martin writes, "He was sent back after not being seen for 12 months.  No recent CBC

was provided for review.  He is feeling well and is contemplating treating his Hep C."  (<u>Id.</u>)

The medical reports prepared by Dr. Martin on April 28, 2013, and April 19, 2015, and

from the Mount Diablo-Solano Oncology Group, do not demonstrate that plaintiff's leukemia was

not in remission when defendant Dhillon treated him in 2013 and 2014.  While plaintiff's

leukemia may not have been in remission in 2012, as suggested by the report from the Mount

Diablo-Solano Oncology Group, Dr. Martin's reports indicate that plaintiff's leukemia was not

"active" in 2013 or even 2015.

Accordingly, the undersigned finds that plaintiff has not demonstrated that his leukemia

was no longer in remission at the time defendant Dhillon treated him.

*Analysis—Whether Defendant Dhillon Acted with Deliberate Indifference*

In the complaint, plaintiff alleges that defendant Dhillon acted with deliberate indifference

to his serious medical needs by failing to prescribe adequate pain medication.  (ECF No. 1 at 4.)

The gravamen of this claim is plaintiff's allegation that defendant Dhillon improperly prescribed

Amitriptyline. Plaintiff alleges that defendant improperly prescribed Amitriptyline because it is a

psychotropic medication, and not a pain medication.  (<u>Id.</u>)  Plaintiff also alleges that Amitriptyline

1    did not adequately control his pain.[1]  (Id.)

2        For the following reasons, the undersigned finds that defendant Dhillon did not act with

3    deliberate indifference when he prescribed Amitriptyline to treat plaintiff's pain.

4        First, the undersigned finds that plaintiff has provided no expert evidence opposing

5    defendants' expert evidence that Amitriptyline was effective to treat chronic pain and neuropathy.

6    The only evidence plaintiff cites in support of his argument that Amitriptyline was not effective in

7    treating chronic pain is Dr. Martin's October 25, 2013 report recommending that Amitriptyline be

8    discontinued.  (ECF No. 39 at 28.)

9        Dr. Martin recommended that plaintiff stop taking all sedating medications, like

10   Amitriptyline.  (Id.)  It is clear from Dr. Martin's report that she made this recommendation based

11   on concerns that plaintiff's fatigue was caused by lack of activity.  (Id.)  Dr. Martin clearly hoped

12   that plaintiff's activity would increase if he stopped taking sedating medications, like

13   Amitriptyline.  In other words, Dr. Martin did not recommend that Amitriptyline be discontinued

14   on grounds that it was not effective to treat pain.

15       Turning to plaintiff's argument that Amitriptyline was not effective to treat his pain, the

16   undersigned finds that defendant Dhillon did not act with deliberate indifference when he

17   determined that Amitriptyline, combined with Tylenol and Tylenol with Codeine, were adequate

18   to treat plaintiff's pain.  Defendant Dhillon's decision to treat plaintiff's pain with these

19   _____

20   [1]   In his declaration submitted in support of his opposition, plaintiff argues that because
     Amitriptyline caused him to suffer side effects, "they" prescribed Nortriptyline, which caused

21   him to suffer the same side effects.  (ECF No. 39 at 22.)  Plaintiff alleges that he told defendant
     Dhillon about the side effects caused by these medications and that neither medication addressed

22   his pain.  (Id.)
        Defendants' summary judgment motion does not address plaintiff's claims regarding side

23   effects caused by Amitriptyline and Nortriptyline or that Nortriptyline did not adequately treat his
     pain because plaintiff's complaint does not contain these claims.  Plaintiff may not amend his

24   complaint by way of his opposition to include additional claims.  Accordingly, plaintiff's claims
     raised in his opposition regarding the side effects caused by Amitriptyline and all of his claims

25   regarding Nortriptyline are disregarded.

26      In his declaration submitted in support of his opposition, plaintiff also argues that defendant
     Dhillon should not have prescribed Tylenol because this medication was not appropriate for

27   someone with liver disease, like plaintiff.  (Id. at 22-23.)  Because plaintiff's complaint raises no
     claim alleging that he should not have received Tylenol because of his liver disease, this claim

28   raised in plaintiff's opposition is disregarded.

1   medications was based on his observations of plaintiff and his knowledge of plaintiff's medical

2   conditions.  While defendant Dhillon may not have observed plaintiff going to the Insulin line, he

3   observed plaintiff during his examinations of plaintiff.  He also received no reports from other

4   CMF staff that plaintiff was unable to perform ADLs.

5        Plaintiff appears to dispute defendant Dhillon's claim that he could perform ADLs by

6   alleging that he was wheelchair bound.  In his supplemental reply, plaintiff states that the medical

7   records demonstrating that he has had a wheelchair for over five years have been "removed, by

8   some strange circumstance." (ECF No. 47 at 9.)  Plaintiff alleges that he is in the process of

9   obtaining these records.  (Id.)  Because plaintiff has had adequate time to obtain these records, the

10   undersigned will not delay resolution of defendants' summary judgment motion while plaintiff

11   attempts to obtain these records.

12        Plaintiff also submitted a medical chrono dated March 13, 2013, stating that he had

13   peripheral neuropathy and unstable ankles.  (Id. at 29.)  Based on these conditions, plaintiff was

14   given boots to help decrease mobility and give more stability for his ankle and neuropathic issues.

15   (Id.)  The chrono concludes, "He is to wear them throughout the facility as per custody for a 1

16   year duration."  (Id.)  Plaintiff has also included a medical chrono dated April 2, 2013, which

17   states that it is a modification to the earlier chrono.  (Id. at 30.)  The April 2, 2013 chrono states

18   that because he is unable to wear shoe laces, he is to wear an ankle brace with Tier 2 size 12 soft

19   soled shoes.  (Id.)

20        If plaintiff was wheelchair bound, as he alleges, then it is unclear why he would have been

21   issued chronos for boots and shoes to wear "throughout the facility."  For these reasons, the

22   undersigned finds that plaintiff has not met his burden of demonstrating the existence of a dispute

23   regarding whether he was wheelchair bound.  Therefore, the undersigned accepts defendants'

24   undisputed evidence demonstrating that plaintiff was not wheelchair bound.

25        In his supplemental reply, plaintiff also argues that he was previously prescribed

26   methadone.  Plaintiff argues that his receipt of this stronger pain medication demonstrates that

27   Amitriptyline was not adequate to treat his pain.  Attached to plaintiff's supplemental reply are

28   medication forms demonstrating that in 2010 and 2011 he was prescribed methadone for pain.

1  (ECF No. 47 at 32-35.)   It is not clear what medical condition methadone was prescribed to treat.

2  However, even assuming that plaintiff previously received methadone to treat his chronic pain

3  and neuropathy, plaintiff has demonstrated, at best, a difference of opinion regarding the proper

4  medications to treat his chronic pain.  See Sanchez v. Vild, 891 F.2d 240, 242 (9th Cir. 1989) (a

5  difference of opinion between medical professionals concerning the appropriate course of

6  treatment generally does not amount to deliberate indifference).  To establish that a difference of

7  opinion amounted to deliberate indifference, the prisoner "must show that the course of treatment

8  the doctors chose was medically unacceptable under the circumstances" and "that they chose this

9  course in conscious disregard of an excessive risk to the prisoner's health." Jackson v. McIntosh,

10 90 F.3d 330, 332 (9th Cir. 1996.)  Plaintiff has not demonstrated that defendant Dhillon's

11 decisions regarding his pain medication demonstrated a conscious disregard to an excessive risk

12 to his health.

13        For the reasons discussed above, the undersigned finds that defendant Dhillon did not act

14 with deliberate indifference with regard to his decision to treat plaintiff's pain with Amitriptyline,

15 combined with Tylenol and Tylenol with Codeine.  Defendant Dhillon based his decision on his

16 knowledge of plaintiff's medical condition and his observations of plaintiff.  See McGuckin v.

17 Smith, 974 F.2d 1050 (9th Cir 1992) (a defendant "must purposefully ignore or fail to respond to

18 a prisoner's pain or possible medical need in order for deliberate indifference to be established.");

19 see also Parlin v. Sodhi, 2012 WL 5411710 at *4 (C.D. Cal. Aug. 8, 2012) ("At its core,

20 plaintiff's claim is that he did not receive the type of treatment and pain medication that he

21 wanted when he wanted it.  His preference for stronger medication—Vicodin, Tramadol, etc.,—

22 represents precisely the type of difference in medical opinion between a lay prisoner and medical

23 personnel that is insufficient to establish a constitutional violation."); Tran v. Haar, 2012 WL

24 37506 at *3–4 (C.D. Cal. Jan. 9, 2012) (plaintiff's allegations that defendants refused to prescribe

25 "effective medicine" such as Vicodin and instead prescribed Ibuprofen and Naproxen reflected a

26 difference of opinion between plaintiff and defendants as to the proper medication necessary to

27 relieve plaintiff's pain and failed to state an Eighth Amendment claim); Ruiz v. Akintola, 2010

28 WL 1006435 at *7 (E.D. Cal. Mar. 17, 2010) (granting summary judgment in favor of defendants

on plaintiff's inadequate medical care claim where he presented no expert evidence that the

Ultram which defendants prescribed, instead of the Norco that U.C. Davis physicians had

recommended, was not medically warranted or reasonable), <u>aff'd</u> No. 10–16516 (9th Cir. Nov. 2,

2011).

Accordingly, defendant Dhillon should be granted summary judgment as to this claim.

*Analysis--Whether Defendants Rading and Clark Acted with Deliberate Indifference*

Plaintiff alleges that defendants Rading and Clark acted with deliberate indifference when

they upheld defendant Dhillon's decisions regarding plaintiff's pain medication.

Defendants Rading and Clark state that they considered plaintiff's complaints regarding

pain medication in their response to plaintiff's administrative grievances.  Defendants argue that

they did not act with deliberate indifference to plaintiff's serious medical needs.

In his declaration, defendant Rading states, in relevant part,

> 3.   At all relevant times, I was a medical doctor employed by CDCR and was acting Chief Physician and Surgeon at the California Medical Facility in Vacaville, California (CMF).  My primary duties were to provide medical care and treatment at CMF, including the review of some, but not all, first level inmate/parolee medical appeals.

> 4.   I have never met plaintiff nor treated him for any medical condition.  However, in May 2013, I conducted first level reviews of two appeals submitted by plaintiff under the CDCR-602 HC inmate/parolee health care appeal form (602 appeal).

> 5.   My review of plaintiff's first level 602 appeals included evaluation of appeal documents submitted by plaintiff, all of plaintiff's medical records, and consultation with plaintiff's primary care provider, Dr. B. Dhillon.

> 6.   In 602 appeal number 13038009, plaintiff disagreed with treatment for pain management.  Attached hereto as Exhibit A is a true and correct copy of the Institution Response for First Level HC Appeal, signed by me, dated May 10, 2013.  Based on my review, as stated in Exhibit A, I determined that the medications Amitriptyline, Tylenol, and Tylenol with Codeine that Dr. Dhillon prescribed to plaintiff were medically appropriate to manage plaintiff's neuropathy and chronic pain.   As plaintiff alleges, Amitriptyline is an antidepressant, but it is also an effective medication to treat neuropathy and chronic pain.   In this case, Amitriptyline, Tylenol and Tylenol with Codeine provided the level of care needed to effectively treat and manage plaintiff's neuropathy and chronic pain.  Plaintiff was awaiting further follow-up with his primary care provider, Dr. Dhillon, regarding his pain

15

management.

7.  Based on my review of 602 appeal number 13038009, I partially granted plaintiff's first level 602 appeal on May 10, 2013.  I signed the first level response, then I forwarded it to the Health Care Appeals Office at CMF, which provided a copy of the written response to Plaintiff.  Review of Plaintiff's first level 602 appeal was my only involvement with plaintiff's appeal regarding treatment for pain management.

(ECF No. 37-2 at 1-2.)

In his declaration, defendant Clark states, in relevant part,

3.  At times relevant to plaintiff's complaint, I was the CEO at CMF.  I was responsible for reviewing some, but not all, inmate/parolee medical appeals.  My other duties and responsibilities as CEO included overall healthcare at the CMF facility.  I am a licensed nurse with a Masters in Business Administration.  I am not a medical doctor.  I have been employed by CDCR for nine years, and have been the CEO at CMF for six years.

4.  I have never met plaintiff nor treated him for any medical condition.  However, in May and July 2013, I conducted second level reviews of two appeals submitted by plaintiff under the CDCR-602HC Inmate/Parolee Health Care Appeal Form (602 appeal).

5.  My review of Plaintiff's second level 602 appeals included evaluation of appeal documents submitted by plaintiff, the first level 602 appeal responses, all of plaintiff's medical records, including all related clinical notes, plaintiff's Unit Health Record, and all CDCR policies and procedures pertinent to plaintiff's 602 appeals.

6.  In 602 appeal number 13038009, plaintiff disagreed with treatment for pain management.  Attached hereto as Exhibit A is a true and correct copy of the Institution Response for Second Level HC Appeal, signed by me, dated May 30, 2013.  Based on my review, as stated in Exhibit A, I determined that the medications Amitriptyline, Tylenol, and Tylenol with Codeine that Dr. Dhillon prescribed to plaintiff were medically appropriate to manage plaintiff's neuropathy and chronic pain.  As plaintiff alleges, Amitriptyline is an antidepressant, but it is also an effective medication for neuropathy and chronic pain.  In this case, Amitriptyline, Tylenol and Tylenol with Codeine provided the level of care needed to effectively treat and manage plaintiff's neuropathy and chronic pain.  Plaintiff was awaiting further follow-up with his primary care provider, Dr. Dhillon, regarding his pain management.

7.  Based on my review of 602 appeal number 13038009, I partially granted plaintiff's second level 602 appeal on May 30, 2013.  I signed the second level response, then I forwarded it to the Health

Care Appeals Office at CMF, which provided a copy of the written response to plaintiff.  Review of plaintiff's second level 602 appeal was my only involvement with plaintiff's appeal regarding treatment for pain management.

(ECF No. 37-1 at 1-2.)

As discussed above, defendant Dhillon did not act with deliberate indifference when he prescribed Amitriptyline, Tylenol, and Tylenol with Codeine to treat plaintiff's pain.  For the same reasons the undersigned finds that defendant Dhillon did not act with deliberate indifference with respect to plaintiff's pain medications, the undersigned finds that defendants Rading and Clark did not act with deliberate indifference in their decisions addressing plaintiff's administrative grievances regarding this issue.  Accordingly, defendants Rading and Clark should be granted summary judgment as to this claim.

Discussion re:  Transfer to CSP-Solano

*Clarification of Plaintiff's Claim*

Plaintiff alleges that even though he is "wheelchair bound, and must be permanently placed in OHU (Outpatient Housing Unit), he was harshly and abruptly carted off, in an unceremonious manner to ad seg (lockdown) and then to CSP-Solano, level II."  (ECF No. 1 at 7.)

Defendants' original summary judgment motion did not address plaintiff's claim that defendants caused him to be transferred to CSP-Solano.  Instead, defendants argued that they did not act with deliberate indifference by denying plaintiff's request to be housed in the OHU at CMF.  Accordingly, on May 22, 2015, the undersigned ordered defendants to file further briefing addressing plaintiff's claim that he was inappropriately transferred to CSP-Solano.  (ECF No. 43.)

In their declarations submitted in support of the supplemental opposition, all defendants state that they did not order plaintiff's transfer to CSP-Solano.  (ECF Nos. 44-2 at 3; 44-3 at 2; 44-4 at 2.)

In his supplemental reply, plaintiff argues that by denying his request to be housed in the OHU, defendants caused him to be transferred to CSP-Solano.  (ECF No. 47 at 5.)  Plaintiff argues that by denying his request to be housed in the OHU, defendants sent the message that

17

1    plaintiff did not require the OHU standard of care and could be transferred to CSP-Solano.  (Id.)

2            In his supplemental reply, plaintiff appears to abandon any claim that defendants ordered

3    his transfer to CSP-Solano.  Instead, plaintiff argues that defendants improperly denied his

4    request to be housed in the OHU.  Because both parties have addressed the merits of plaintiff's

5    claim regarding the denial of his request to be housed in the OHU, the undersigned addresses this

6    claim herein.

7            The undersigned further clarifies that the gravamen of this claim is plaintiff's allegation

8    that he should have been housed in the OHU because he is wheelchair bound.

9        *Analysis*

10           Defendants argue that they did not act with deliberate indifference when they denied

11   plaintiff's administrative grievances requesting placement in the OHU because placement in the

12   OHU was not medically necessary.

13           In his original declaration, defendant Dhillon states, in relevant part,

14               10.   In 602 appeal number 13038045, plaintiff requested to be
             placed in an Outpatient Housing Unit (OHU).  Attached hereto as
15           Exhibit B are true and correct copies of Plaintiff's appeal records,
             including the first, second and third level Institution Responses to
16           this appeal, which are also attached to plaintiff's complaint.  On
             May 21, 2013, I saw and interviewed plaintiff in ACC regarding
17           this 602 appeal.  As stated in the Exhibit B documents, CMF
             medical staff and I determined that plaintiff's placement in an OHU
18           was not medically appropriate.  Placement in an OHU was not
             medically necessary because plaintiff was able to ambulate without
19           support and could perform activities of daily living without
             assistance.  Plaintiff was encouraged to communicate with me
20           about any change in his medical condition that could, at any time,
             necessitate housing in an OHU.  Plaintiff's first and second level
21           602 appeals regarding an OHU placement were denied.  See Exhibit
             B, first level response dated May 22, 2013; and second level
22           response dated July 9, 2013.

23   (ECF No. 37-3 at 3.)

24           In his original declaration, defendant Clark also states, in relevant part,

25                8.   In 602 appeal number 13038045, plaintiff requested to be
             placed in an outpatient housing unit (OHU).  Attached hereto as
26           Exhibit B is a true and correct copy of the Institution Response for
             Second Level HC Appeal, signed by me, dated July 9, 2013.  Based
27           on my review, as stated in Exhibit B, I found nothing to show that
             plaintiff's placement in an OHU was medically appropriate.
28           Plaintiff had been in and out of an OHU since 2008.  A change in

                                          18

his medical condition could, at any time, necessitate housing in an OHU. But placement in an OHU was not medically necessary because plaintiff was able to ambulate without support and could perform activities of daily living without assistance. Plaintiff was encouraged to communicate with his primary care provider about any change in his medical condition that could, at any time, necessitate housing in an OHU.

(ECF No. 37-1 at 3.)

In his original declaration, defendant Rading states that in reviewing plaintiff's grievance requesting placement in an OHU, he also found that placement in an OHU was not medically necessary because plaintiff was able to ambulate without support and could perform activities of daily living without assistance. (ECF No. 37-2 at 3.)

As discussed above, in his supplemental declaration, defendant Dhillon stated that plaintiff's records show that he has not been issued a wheelchair permanently. (ECF No. 44-2 at 2.) Regarding his transfer to CSP-Solano, defendant Dhillon states in his supplemental declaration,

7. Plaintiff's transfer from CMF to Solano did not affect his access to sufficient medical care for his medical care conditions.

a. I did not order plaintiff's transfer from CMF to CSP Solano.

b. In my opinion, the medical care plaintiff would receive at CSP Solano for his medical conditions would not be different than at CMF. CSP Solano has the medical staff and facilities to properly treat plaintiff, who had Diabetes Mellitus, Hypertension, Osteoarthritis of his knees, history of Carpel Tunnel Syndrome, Peripheral Neuropathy, Asthma, Hepatitis C and history of drug abuse. Although plaintiff did not have leukemia, he could have been referred to an oncologist if needed from either CMF or CSP Solano; leukemia patients at both institutions are referred to outside specialists. Thus, CSP Solano had the resources to provide plaintiff with the same medications he was prescribed at CMF, and any other medications that medical staff prescribed to treat plaintiff's medical conditions.

c. One notable difference between CMF and CSP Solano was the availability of general acute care hospital beds; although CMF no longer has these beds today, at that time CMF had them and CSP Solano did not. At no relevant time, did plaintiff need a general acute care hospital bed while housed at CMF. Therefore, plaintiff would not receive insufficient medical care for his conditions by transferring to a prison without general acute care hospital beds.

d. CSP Solano did not have Outpatient Housing Unit (OHU), but in my opinion, plaintiff's transfer to an OHU at CMF was not

warranted.   Therefore, plaintiff would not receive insufficient medical care for his conditions by transferring to a prison without an OHU.

e. Plaintiff's transfer to CSP Solano would not affect his access to emergency medical care outside the prison.  Because CMF and CSP Solano are adjacent facilities, the proximity of an inmate's access to outside emergency medical care is the same.

f. As a physician at CMF, I can issue a medical hold to delay an inmate's transfer to another prison for medical reasons.  Medical holds are typically used when transfer to another facility could adversely affect an inmate's medical needs, such as an inmate with a pending scheduled surgery.   In my opinion, nothing about plaintiff's medical condition warranted a medical hold to delay his transfer to another prison.

g. At no time did I discharge plaintiff from an OHU.  At no time relevant was plaintiff housed in an OHU when I provided medical care for him.

8. Based on my examinations and treatment of plaintiff, as well as my review of his complaint, his 602 appeal documents, and pertinent medical records, it is my opinion that I provided plaintiff all reasonable and necessary care consistent with community standards as well as CDCR policies and procedures.   Plaintiff received prompt medical care for his pain management and general medical care from me and other physicians and medical staff at CMF.   At no time did I believe plaintiff's transfer from CMF to CSP Solano would prevent plaintiff from receiving sufficient medical care for his medical conditions, including sufficient pain medication, among other things.

(Id. at 3-5.)

Turning to the merits of plaintiff's claim that he should have been housed in an OHU, the undersigned observes that neither party has addressed what an OHU is and what medical conditions warrant housing in an OHU.  In his supplemental declaration, defendant Dhillon states that if an inmate at CMF cannot perform ADLs, then they are transferred to the Correctional Treatment Center.  (ECF No. 44-2 at 3.)  However, in his supplemental declaration defendant Dhillon also goes on to state that in his opinion, plaintiff's transfer to an OHU at CMF was not warranted.  (Id. at 4.)  In his original declaration, defendant Dhillon stated that plaintiff did not qualify for placement in an OHU because he was able to ambulate and perform ADLs.  (ECF No. 37-3 at 3.)  Defendants do not clarify the difference between the Correctional Treatment Center and the OHU.

In any event, it is clear that both parties agree that housing in an OHU is warranted if an inmate cannot ambulate without support and cannot perform the activities of daily life.[2]  Plaintiff has offered no evidence disputing defendant Dhillon's statement in his declaration that plaintiff was able to perform ADLs.  As discussed above, it is undisputed that plaintiff was not wheelchair bound.  Thus, plaintiff did not meet the undisputed criteria on which he alleges his placement in the OHU was warranted.

Because plaintiff did not meet the criteria for placement in an OHU, defendants did not act with deliberate indifference when they denied his requests to be placed in the OHU. Accordingly, defendants should be granted summary judgment as to this claim.

Qualified Immunity

Defendants also move for summary judgment on grounds that they are entitled to qualified immunity.  Because the undersigned finds that defendants should be granted summary judgment as to the merits of plaintiff's claims, there is no need to address qualified immunity.

Accordingly, IT IS HEREBY ORDERED that the Clerk of the Court is directed to serve a copy of these findings and recommendations on Supervising Deputy Attorney General Monica Anderson; and

////

---

[2]  In Handy v. Williams, 2010 WL 1444520 at *4 (E.D. Cal. 2010), Magistrate Judge Drozd described the OHU at CMF and the OHU placement criteria:

> CMF's OHU, units G-3 and H-1, provides 24-hour nursing care to inmate patients... Placement criteria in OHU includes: (1) patient does not require hospice, CTC, GACH, or Community Hospital; (2) patient requires daily access to nursing staff; (3) convalescence from recent surgery or illness; (4) patient has a cast and needs assistance with daily living; (5) temporary dietary restrictions or special diet; (6) preparation for special procedures; (7) mild dementia, mild organic brain syndrome, or requires supervision because of memory loss; (8) loss of bowel or bladder function, *(9) neuromuscular disorders that require assistance with activities of daily living;* (10) patients who require PRN oxygen administration or breathing aids (patients can now be on the mainline with oxygen concentrators and get breathing treatments in the B-1 clinic). Placement in OHU is subject to a medical doctor or nurse practitioner's judgment.

Handy v. Williams, 2010 WL 1444520 at *4 (E.D. Cal. 2010) (emphasis added).

1    IT IS HEREBY RECOMMENDED that defendants' summary judgment motion (ECF

2    No. 37) be granted.

3    These findings and recommendations are submitted to the United States District Judge

4    assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within fourteen days

5    after being served with these findings and recommendations, any party may file written

6    objections with the court and serve a copy on all parties.  Such a document should be captioned

7    "Objections to Magistrate Judge's Findings and Recommendations."  Any response to the

8    objections shall be filed and served within fourteen days after service of the objections.  The

9    parties are advised that failure to file objections within the specified time may waive the right to

10   appeal the District Court's order.  Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

11   Dated:  August 21, 2015

12

13   _____
     KENDALL J. NEWMAN
14   UNITED STATES MAGISTRATE JUDGE

15   Pej2637.sj

16

17

18

19

20

21

22

23

24

25

26

27

28

22